IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| ALEXIS C. NORMAN, # 49210-177, § <br> Movant, § <br> § <br> v. § <br> § <br> UNITED STATES OF AMERICA § <br> Respondent. § | Civil No. 3:17-CV-467-B-BK <br> (Criminal No. 3:15-CR-66-B-1) |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to 28 U.S.C. § 636(b) and *Special Order 3*, Norman's motion to vacate, set aside, or correct her sentence under 28 U.S.C. § 2255 was referred to the United States magistrate judge. Upon review of the relevant pleadings and applicable law, and for the reasons detailed herein, it is recommended that the motion be summarily **DENIED** as meritless and Norman's claims be **DISMISSED WITH PREJUDICE**.

**I.   BACKGROUND**

Alexis C. Norman pleaded guilty to one count of healthcare fraud.   Crim. Doc. 66. Norman admitted that, from December 2, 2009, through June 30, 2014, she submitted fraudulent claims for Medicaid benefits for psychotherapy sessions that were never performed on behalf of more than 500 Medicaid clients, most of whom were minor children.   Crim. Doc. 21 at 3.

A presentence investigation report ("PSR") was prepared to aid the Court in determining Norman's advisory sentence under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines").   Crim. Doc. 30-1.   Applying the 2014 Guidelines, the PSR recommended a total offense level of 33.   Crim. Doc. 30-1 at 9.   That figure included an 18-level increase because Norman's intended loss—$5,502,724.88—was more than $2.5 million but less than $7 million, as well as a three-level reduction for acceptance of responsibility.   Crim. Doc. 30-1 at

7-8. A subsequent addendum to the PSR applied the 2015 Guidelines, lowering Norman's total offense level to 29. Crim. Doc. 35-1 at 4-5.

Norman objected to the PSR, arguing that it overestimated the loss amount. Crim. Doc. 59. She urged that she knew Medicaid would, in fact, pay her less than what she billed the program because she knew that it capped its reimbursements at a percentage of cost-billed:

> For instance, if a particular service was billed at $5,000.00 but the allowable amount of the fixed fee schedule is $2,500.00 Medicaid will only pay 70% of the fixed fee amount or in this example, $1,750.00. It would not matter if the provider billed $7,500.00, $10,000 or any other amount. . . .

Crim. Doc. 59 at 2-3.

At sentencing, the Court considered the parties' objections to the PSR. *See* Crim. Doc. 70; Crim. Doc. 72. In support of her written objection to the PSR, Norman testified that she knew Medicaid would pay her less than what she billed. Crim. Doc. 70 at 139-142; Crim. Doc. 72 at 29-34. And she argued—for the first time—that some of the allegedly fraudulent claims were, in fact, legitimate, and should be excluded from the loss amount. *See* Crim. Doc. 70 at 43.

At the end of the hearing, the Court found that Norman's testimony was self-serving and not credible. Crim. Doc. 70 at 177, 179. The Court rejected Norman's claim that she knew that Medicaid would pay only a fixed-percentage of the fraudulent claims, as well as her post-hoc attempts to make some of the fraudulent claims appear legitimate. Crim. Doc. 70 at 177. The Court thus concluded that Norman intended to defraud Medicaid of $5,502,724.88. Crim. Doc. 70 at 177.

Over the government's objection, the Court awarded Norman a two-level reduction for acceptance of responsibility. Crim. Doc. 70 at 177-178. However, in light of Norman's

2

arguments that many of her fraudulent claims were actually legitimate, the government exercised its discretion to withhold its assent to the reduction of a third point. Crim. Doc. 70 at 177-178. In all, the Court fixed Norman's total offense level at 30. Crim. Doc. 70 at 180. And, applying the factors set out in 18 U.S.C. 3553(a), the Court sentenced Norman to 105 months' imprisonment with a three-year term of supervised release. Crim. Doc. 70 at 187-194; *see also* Crim. Doc. 66. The Court noted that it would have imposed the same sentence even if the government had moved for a one-level reduction under U.S.S.G. § 3E1.1(b). Crim. Doc. 70 at 187-194. Norman did not file a direct appeal.

Norman's section 2255 motion raises 16 claims of ineffective assistance of counsel. Although she does not present her claims in chronological order, the Court assesses them that way: first addressing her claims that counsel was ineffective with respect to her plea agreement, and then addressing her challenges of counsel's performance at sentencing.

## II.   INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

The Sixth Amendment to the United States Constitution guarantees a defendant reasonably effective assistance of counsel at all critical stages of a criminal proceeding. *See Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980). To obtain post-conviction relief on a claim that her counsel was constitutionally ineffective, Norman must satisfy the two-pronged test set out in *Strickland v. Washington*, 466 U.S. 668 (1984). First, she must show that counsel's performance fell below an objective standard of reasonable professional service. *See id.* at 687. Second, she must establish that his counsel's substandard performance caused prejudice. *See id.* at 691-92.

3

### A. Counsel's Performance at the Plea Stage

#### 1. Claim 14–counsel's failure to secure Norman's knowing and voluntary agreement to plead guilty.

In claim (14), Norman argues that her counsel was ineffective in negotiating her plea agreement and encouraging her to accept it.

Norman first challenges her plea counsel's investigation into her case, claiming that he provided ineffective assistance by failing to "move [the] Court to request a copy of the government's file and/or evidence against [her]." Doc. 4 at 20. To succeed on her challenge to her counsel's investigation into her case, Norman is required to "allege with specificity what [further] investigation would have revealed and how it would have altered the outcome" of the proceeding. *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989). But Norman has done neither. She makes no attempt to show what—if anything—counsel would have discovered had he moved the Court for additional discovery. And she offers no explanation as to how any additional discovery would have impacted the outcome of her proceedings. Thus, Norman is not entitled to relief on her claim that counsel failed to conduct an adequate pre-plea investigation.

Norman next alleges that her counsel was ineffective because he never explained to her the concept of relevant conduct—that is, how the amount of loss that she intended to cause would impact her sentence under the Sentencing Guidelines—and so her plea was unknowing and involuntary. *See* Doc. 4 at 20-21 ("The movant did not know that by pleading guilty to 1 count of healthcare fraud in the amount of $240.00, she was exposing herself to being sentenced using the relevant conduct amount of $5,502,724.88 . . . . The movant's attorney never explained relevant conduct to the movant.").

4

To succeed on this claim, Norman must present "independent indicia of the likely merit of [her] allegations" that her plea counsel never explained the concept of relevant conduct. *United States v. Reed*, 719 F.3d 369 (5th Cir. 2013). She has not done so. Moreover, the record evidence shows exactly the opposite.

Norman's plea counsel signed an affidavit averring that he "explained the concept of relevant conduct to Ms. Norman, as well as her sentencing guidelines." Doc. 28 at 34. Although Norman submitted her own affidavit, in which she made several statements about her counsel's actions, she never averred that her plea counsel failed to explain to her the concept of relevant conduct. *Cf.* Doc. 24 at 18-19; *see also United States v. Kayode*, 777 F.3d 719, 724 (5th Cir. 2014) (discounting the movant's reliance on his affidavit where it did not specifically support post-conviction claim). Thus, the only direct evidence on this point runs counter to Norman's allegations.

Norman's allegations are further undercut by the record of the criminal proceedings. Specifically, in her factual resume, Norman admitted that she had submitted claims totaling $5,502,724.88, but that she specifically "retain[ed] the right to present evidence of legitimate claims at sentencing." Crim. Doc. 21 at 4. Norman also signed a plea agreement in which she acknowledged that she had "thoroughly reviewed all legal and factual aspects of this case with her lawyer and . . . [had] received from her lawyer explanations satisfactory to her concerning each paragraph of this amended plea agreement, each of her rights affected by this agreement, and the alternatives available to her other than entering into this agreement." Crim. Doc. 24 at 6-7. One critical "legal and factual aspect" of this case was Norman's conduct in an unrelated, uncharged fraud scheme—one that involved "food and beverage programs administered by the United States Department of Agriculture." Crim. Doc. 24 at 3. Norman and the government

5

agreed that her conduct in that scheme "shall be considered *relevant conduct for purposes of restitution only*," not relevant conduct for sentencing purposes. *Id.* at 3 (emphasis added). The way in which Norman carefully negotiated her plea agreement to limit the impact of her relevant conduct at sentencing—by excluding her uncharged fraud from the analysis of her relevant conduct and permitting her to rebut the government's position on the loss amount—is entirely consistent with her counsel's sworn statement that he did explain to Norman the concept of relevant conduct. Most telling is that Norman never sought to withdraw her guilty plea as unknowing and involuntary after the release of the PSR that held her accountable for relevant conduct. Because Norman's claim is unsubstantiated and contradicted by the record evidence, she has not met her burden to show that her plea counsel was ineffective. *See United States v. Arledge*, 597 F. App'x 757, 759 (5th Cir. 2015) (per curiam) ("When deciding whether an affidavit supporting a § 2255 motion may be discredited or given less weight without an evidentiary hearing, this Court has looked to factors such as whether an affidavit is speculative, conclusory, plainly false, or contradicted by the record.").

Even if Norman could establish deficient performance, she cannot show prejudice. Because Norman pleaded guilty, to establish prejudice, she "must show that there is a reasonable probability that, but for counsel's errors, [s]he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). To do so, she "must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Kayode*, 777 F.3d at 724 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010)). In weighing Norman's claim of prejudice, the Court considers (1) the totality of the circumstances, including Norman's evidence to support her assertion, (2) her likelihood of

6

success at trial, (3) the risks that she faced by proceeding to trial, and (4) whether Norman attempted to withdraw her guilty plea. *See, e.g.*, *Kayode*, 777 F.3d at 725.

Norman has offered no evidence to support her allegation that, had her plea counsel "explained the concept of relevant conduct," she would have insisted on going to trial. Her affidavit is of no help. In it, she avers, "[h]ad I been mentally able to comprehend the concept of relevant conduct . . . I would not have pleaded guilty." Doc. 24 at 19. But Norman points to psychological distress stemming from her arrest—not her counsel's failure to explain the concept of relevant conduct—as the reason she could not comprehend that concept. *See* Doc. 24 at 18-19. Thus, Norman has offered no evidence to show that she would have insisted on a trial but for counsel's allegedly deficient performance, and so this factor weighs against finding prejudice. *See, e.g.*, *Kayode*, 777 F.3d at 724 (concluding that the movant had not supported his allegations of *Strickland* prejudice with evidence in his affidavit, which "ma[de] a number of sworn statements about his counsel's actions" but did "not aver that he would have gone to trial had he known of the immigration consequences of his plea.").

The same is true of the remaining factors. Although Norman claims that she came to realize the importance of relevant conduct before her sentencing hearing, she never moved to withdraw her guilty plea on the basis of plea counsel's alleged failure to explain the concept before she decided to plead guilty. *Cf. Kayode*, 777 F.3d at 727 ("Another factor in our analysis is whether the defendant previously moved to withdraw his guilty plea.").

"Another important factor is whether the defendant has demonstrated that [she] was likely to succeed at trial." *Id.* at 725. Norman was sure to lose at trial as the evidence against her was overwhelming. As Special Agent Ortiz testified at sentencing, Norman had claimed false benefits on behalf of numerous counsellors who never worked for her. The FBI had

7

"interviewed many of the former counsellors," who confirmed that Norman's submissions were fraudulent. Crim. Doc. 70 at 15-27. The FBI had also "executed a couple of search warrants," "subpoenaed bank records," and "interviewed some of the patients" for whom Norman had claimed benefits. Crim. Doc. 70 at 15. The FBI's investigation produced strong evidence of Norman's guilt, and she has no made attempt here to "demonstrate that [she] was likely to succeed at trial." See *Kayode*, 777 F.3d at 725.

Nor has she addressed the fact that the government dismissed one count of healthcare fraud and agreed not to prosecute her for fraud against the USDA, in exchange for her guilty plea. See Crim. Doc. 24 at 3. Had Norman proceeded to trial, she could have also risked additional convictions—for another count of healthcare fraud and for her fraud against the USDA—which would have greatly increased her sentencing exposure. These realities belie Norman's unsupported allegation that she would have pleaded not guilty if only she had understood the concept of relevant conduct.

Most importantly, Norman's sworn testimony at her rearraignment hearing runs counter to her claim that, but for her plea counsel's failure to explain relevant conduct, she would have pleaded not guilty and insisted on going to trial. Norman averred under oath that she had discussed with plea counsel the Sentencing Guidelines that might apply in her case, but that she nevertheless understood that only the Court could determine exactly what her sentence would be. Crim. Doc. 81 at 7. The Court admonished her that she "should never depend or rely on any statement or promise by anyone, including [plea counsel], as to exactly what sentence you'll get because ultimately only [the Court] can make that decision." Crim. Doc. 81 at 7. Norman swore that she understood, and affirmed to the Court that she wished to plead guilty. Crim. Doc. 81 at 16-17.

8

Norman's "[s]olemn declarations in open court carry a strong presumption of verity," forming a "formidable barrier in any subsequent collateral proceedings." *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977). Although that presumption of truth may be rebutted where the movant "produces independent indicia of the likely merit of her allegations, typically in the form of one or more affidavits from reliable third parties," *Cervantes*, 132 F.3d at 1110, Norman has offered no reliable evidence to overcome her sworn statements to the Court. *See, e.g.*, *United States v. Franks*, 397 F. App'x 95, 99-100 (5th Cir. 2010) (applying *Cervantes* and affirming the district court's decision to deny the section 2255 motion without an evidentiary hearing where the movant produced only unreliable evidence to support the allegations in his motion).

In sum, Norman is entitled to no relief on her claim that her counsel failed to explain the concept of relevant conduct.

Norman next alleges that her plea counsel promised her that she would receive a lower sentence pursuant to a "5K1.1 departure," and encouraged her to simply "to answer all questions with a 'yes' or 'no' response at the plea colloquy to falsely state that she was satisfied with her counsel's performance and that she had been informed of the facts of the case." These claims, too, are unsubstantiated and belied by Norman's sworn statements to the Court.

At the rearraignment hearing, the Court admonished Norman that, if she chose to plead guilty, "[her] plea must not be induced or prompted by any pressure, threats, force, or coercion of any kind or by any promises other than promises in a plea agreement with the government." Crim. Doc. 81 at 11. The Court then squarely asked her "has anyone in any way tried to get to you to make you plead guilty in this case?" She replied, "No, sir." Crim. Doc. 81 at 11. Norman's sworn statements—that no one had made her any promises beyond those in her plea agreement, and that she was pleading guilty because she was guilty—are entitled to a

9

presumption of verity in this habeas proceeding. *Cervantes*, 132 F.3d at 1110. Because Norman has offered no reliable evidence to rebut that presumption, she is not entitled to relief on her claim that her counsel misled her into pleading guilty.

Norman has established neither deficient performance nor prejudice, and so the Court should reject claim (14).

### 2. Claim 11 – counsel's failure to challenge the government's breach of the plea agreement.

In claim (11), Norman alleges that counsel was ineffective for failing to assert that the government breached her plea agreement when it: (1) refused to file a motion for downward departure under U.S.S.G. § 5K1.1; (2) urged the Court not to grant Norman a three-level reduction for acceptance of responsibility; and (3) modified the language of the plea agreement—unilaterally, and without Norman's consent—as to the USDA restitution amount. Crim. Doc. 4 at 16-17.

As set out below, the government did not breach the plea agreement in either way Norman alleges. It follows, of course, that her counsel cannot be deemed ineffective for failing to claim otherwise.

"[T]he Government may bargain away its discretion concerning whether to file a motion for a downward departure based on a defendant's substantial assistance under U.S.S.G. § 5K1.1." *United States v. Handy*, 182 F. App'x 341, 342 (5th Cir. 2006) (per curiam). But the government did not do so here. Rather, the plea agreement made plain that the government expressly retained its discretion to file—or not file—a motion under § 5K1.1. *See* Doc. 22 at 1 ("If, in its sole discretion, the government determines that the defendant has provided substantial assistance in the investigation or prosecution of others, it will file a motion urging sentencing

10

consideration for that assistance."). Thus, Norman cannot show that the government breached the plea agreement when it exercised its discretion and chose not to file a § 5K1.1 motion, which is fatal to her ineffective assistance of counsel claim. See *Handy*, 182 F. App'x at 343.

Norman also claims that the government breached the plea agreement when it moved the Court to deny her a three-level reduction for acceptance of responsibility in response to her arguments at sentencing that many of her fraudulent claims were actually legitimate. See Doc. 4 at 16. "In determining whether the terms of the plea agreement have been violated, the court must determine whether the government's conduct is consistent with the parties' reasonable understanding of the agreement." *United States v. Wilder*, 15 F.3d 1292, 1295 (5th Cir. 1994). Here, paragraph 7 of the Amended Plea Agreement states the government's responsibilities under the agreement: the government agreed not to prosecute Norman for her USDA fraud and to dismiss any remaining charges in the pending indictment. Crim. Doc. 24 at 4. And, while Norman reserved the right to present evidence of legitimate claims at sentencing, the plea agreement was silent as to whether the government would recommend an offense-level reduction for acceptance of responsibility. Cf. *United States v. Gonzalez*, 519 F. App'x 238, 239 (5th Cir. 2013) (examining a plea agreement in which the government "promise[d] to recommend that Gonzalez receive 'full credit for acceptance of responsibility.'"). Because nothing in the plea agreement barred the government from urging the Court to deny Norman a three-level reduction of acceptance of responsibility in response to her attempts at sentencing to disavow her earlier admissions, the government did not breach the plea agreement. Moreover, to the extent that Norman believed that she could argue at sentencing that many of her fraudulent claims were legitimate without the government countering that she should not receive the full benefit of a three-level reduction, her belief was unreasonable.

11

Norman—pointing to the government's objection to the PSR—also claims that the government moved to modify the plea agreement without her consent. *See* Doc. 4 at 17. But Norman misreads the government's objection to the PSR, which sought only to correct a possible misperception created by the language of the PSR:

> In the Amended Plea agreement, the defendant agreed to pay restitution in connection with her USDA food program fraud "in an amount to be determined by the U.S. Probation Office and the Court, in addition to any other order of restitution." She did not agree to pay a specified amount in the Amended Plea Agreement. The description of this agreement in the Addendum [to the PSR], however, appears to suggest that the defendant specifically agreed in the Amended Plea Agreement to pay restitution in the amount of $374.000.
>
> While the government stands by its loss calculation of $374,000, and the probation officer adopted that calculation (Addendum at 3), it has not yet been accepted by the Court. Accordingly, the Addendum should be clarified to note that the defendant has only agreed to pay the amount determined by the Court.

Crim. Doc. 58 at 1-2.

Because nothing in the government's objection "modified" the plea agreement, Norman's counsel was not ineffective for failing to argue that the agreement was breached.

There is no merit to claim (11).

### B. Counsel's Performance at Sentencing

The lion's share of Norman's claims challenge her counsel's conduct at sentencing. For these reasons explained below, all of her claims are meritless.

### 1. Claim 2 – counsel's failure to object to the government's refusal to move for an additional one-point reduction for acceptance of responsibility.

In Claim (2), Norman contends that her counsel should have objected when the government refused to move for a further reduction in her offense level under U.S.S.G. § 3E1.1(b). Doc. 4 at 9. But Norman cannot show deficient performance because her counsel did argue to the Court that she was entitled to a full three-level reduction under § 3E1.1. Crim.

12

Doc. 70 at 173 (arguing that "we have a situation here where all three levels would be appropriate and applicable."). And she cannot show prejudice because the Court agreed with the government that it could choose not to move to reduce Norman's offense level under § 3E1.1(b), *see* Crim. Doc. 70 at 175, and because the Court made clear that it would have imposed the same sentence regardless of whether the government moved the additional one-point reduction, *see* Crim. Doc. 70 at 194. Thus, Norman is not entitled to relief on Claim (2).

### 2. Claim 3 – counsel's failure to argue against the inclusion of loss amounts resulting from events that postdated the conclusion of the criminal offense.

There also is no merit to claim (3), in which Norman alleges that her counsel should have argued that the offense "ended" on January 11, 2013. *See* Doc. 4 at 10 ("The offense of conviction end date is January 11, 2013," meaning that "[c]laims submitted and payments received after the offense end date of January 11, 2013 cannot be included in the intended and actual loss amounts."). Contrary to Norman's assertion, her crime spree did not end in early 2013. Indeed, in her negotiated plea agreement and factual resume, she stipulated that her scheme to defraud spanned from December 2, 2009, through June 30, 2014. Crim. Doc. 21 at 2. Because the Court properly considered all of the fraudulent bills that Norman sent during that period when it fixed her loss amount, *see United States v. Isiwele*, 635 F.3d 196, 202 (5th Cir. 2011), her counsel was not required to raise this meritless objection.

### 3. Claim 4 – failure to object to the Court's extrapolation from evidence about a limited number of claims that all submitted claims were fraudulent.

In claim (4), Norman contends that her counsel should have objected when the Court inferred that all of her claims were fraudulent after only hearing evidence about the claims that she submitted on behalf of 28 Medicaid beneficiaries—far fewer than the 500 plus beneficiaries

13

for whom she submitted claims.   Doc. 4 at 10-11.   Because the Court correctly calculated the loss amount, there was no legitimate objection for counsel to raise.

When deciding the amount of loss, "[t]he district court need only make 'a reasonable estimate of the loss,' based on its assessment of the evidence." *United States v. Hernandez*, 876 F.3d 161, 165 (5th Cir. 2017) (per curiam) (discussing U.S.S.G. § 2B1.1, cmt. n.3(c)). Norman's argument rests on a cramped view of the evidence—the 28 minors for whom she submitted false claims that totaled $8,341.08—and ignores the other evidence that was before the Court at sentencing, including Agent Ortiz's testimony that the FBI interviewed 12 counsellors whose names Norman had used to claim false benefits.   *See* Crim. Doc. 70 at 15-40.   As the government established at sentencing, the claims that Norman submitted on behalf of those 12 counsellors totaled millions of dollars.   *See* Crim. Doc. 70 at 15-40 (indicating the exact amount that Norman had billed Medicaid in the name of each of the 12 counsellors).   Each of those claims were fraudulent.   Agent Ortiz's testimony explaining exactly how much Norman had billed in the name of these 12 counsellors—coupled with the FBI agents' determination that all of Norman's claims were illegitimate—provided ample evidence on which the Court could base its loss determination.   *See* Crim. Doc. 70 at 15 (describing the government's sentencing exhibit, which showed that Norman billed Medicaid for $5,502,724.88).   Because the Court had that evidence before it, and because its estimation of the loss amount was reasonable, the Court committed no error to which Norman's counsel should have objected.

**4. Claim 5 – counsel's failure to argue that legitimate claims not be included in the calculation of the loss amount.**

Norman next alleges that her counsel was ineffective for failing to argue that the Court must subtract from the loss amount the claims for services that were legitimate.   Doc. 4 at 12-

14

13. At sentencing, Norman testified that some of her claims were "legitimate" and "clean," *see* Crim. Doc. 72 at 21-22, but the Court rejected her testimony. Specifically, the Court found that Norman was not a credible witness and rejected her representation that she had performed some legitimate services, which should be discounted against her loss amount. Crim. Doc. 70 at 171-72 ("I do not – did not find her a credible witness. I think the government outlined all of the bases that they put forward as to why they didn't believe what she had to say . . . and I think those are sound. So I don't think the defense has really put a dent in the – right now, the figure of the intended loss."). Considering the Court's finding that there were no legitimate claims, Norman cannot establish any prejudice stemming from her counsel's failure to argue for such an offset. Thus, there is no merit to claim (5).

     5. **Claim 8 – counsel's failure to argue that money recouped from the government's sale of Norman's home should offset the loss amount**.

In claim (8), Norman argues that her counsel was ineffective when he failed to urge the Court to reduce her loss amount under U.S.S.G. § 2B1.1 by "roughly $400,000"—the amount that the government recouped when it foreclosed on her home. Doc. 4 at 13-14. Application Note 3(E) of U.S.S.G. § 2B1.1 lists the credits that the Court must apply against the loss amount. Note 3(E)(i) provides that the Court should reduce the loss amount by "[t]he fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." U.S.S.G. § 2B1.1 cmt. n.3(E)(i). Norman is not entitled to any credit under that section for several reasons, including that the government did not recoup any of its losses before the offense was detected. Norman was indicted in February 2015, but her home was not sold at foreclosure until February 2016. Doc. 4 at 13. In fact, for many months after she was indicted, Norman obstructed the

15

government's efforts to use her house to recoup a portion of its losses. See Crim. Doc. 34 at 2-3 (describing Norman's refusal to sign a stipulation of forfeiture). Counsel was not ineffective for failing to raise this meritless challenge, and so Norman is entitled to no relief on claim (8).

### 6. Claim 10 – counsel's failure to call counsellors as witness at sentencing.

Nor is Norman entitled to relief on claim (10), in which she urges that her counsel was ineffective for failing to call the counsellors whose names she used on the fraudulent bills as witness at sentencing. See Doc. 4 at 15. Norman names five counsellors—MacArthur Gilmer, Lee Robinson, Shellie Williams, Audrey Williams, and Samuel Birkner, whom she claims would have testified: "1) they were employed by [Norman], 2) signed a Medicaid Provider Agreement, and 3) provided psychotherapy services for [Norman's] company." See Doc. 4 at 15. She also claims that counsel could have called "an additional twelve counsellors" to testify that they provided legitimate services for Norman's companies. See id.

The Court of Appeals for the Fifth Circuit "has repeatedly held that complaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative." Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009). To succeed on her claim that her counsel was ineffective for failing to call the 17 counsellors, Norman must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of their proposed testimony, and show that it would have been favorable to a particular defense. See, e.g., King v. Davis, 883 F.3d 577, 591 (5th Cir. 2018). Norman has not done so—she has provided no affidavit from any prospective witness that outlines their willingness to testify, let alone shown how their testimony would have helped her.

16

Moreover, it strains credulity that any one of those witnesses would have testified and that their testimony would have aided Norman. When those counsellors were interviewed by the FBI, each explained that they did not provide the services that Norman had claimed when she submitted fraudulent bills using their names and Medicaid provider information. *See, e.g.*, Crim. Doc. 70 at 35-36 (describing why the FBI concluded that Norman had fraudulently billed $794,017.40 using MacArthur Gilmer's name). In fact, one counsellor, whose information Norman used to submit fraudulent claims, wrote the Court a letter explaining in painstaking detail how Norman's fraudulent scheme "ruined" his "name and [his] credentials" after he had "worked years to uphold to the highest standard" in his profession. *See* Crim. Doc. 70 at 193. The record developed at sentencing plainly belies Norman's allegations—which are unsupported and conclusory—that the counsellors would have offered helpful testimony. As such, Norman cannot show that her counsel was ineffective when he chose not to call the witnesses or any prejudice stemming from that choice. Thus, she is entitled to no relief on claim (10).

### 7. Claim 12 – counsel's failure to request the Court to consider the section 3553(a) factors

Norman next alleges, in claim (12), that her counsel was ineffective when he failed to explicitly ask the Court to apply the factors listed in 18 U.S.C. § 3553(a). *See* Doc. 4 at 18 (arguing that had sentencing counsel moved the Court to apply the § 3553(a) factors, "[t]here is a high probability that the District Court would have used its discretion to give weight to the cooperation evidence and provide the movant with a departure."). Because the Court made clear that it was applying each of the § 3553(a) factors as it fashioned Norman's sentence, there was no need for her counsel to urge the Court to do so. *See* Crim. Doc. 70 at 188 ("I am

considering all of the 3553 factors in making this determination."). Thus, the Court should reject the claim of ineffective assistance of counsel raised in claim (12).

### 8. Claim 13 – counsel's failure to argue that only conduct of others is relevant conduct

In claim (13), Norman asserts that her counsel should have challenged the Court's determination of the loss amount on the ground that "[r]elevant conduct cannot include the conduct of the movant" and is instead limited only to "the conduct of others." *See* Doc. 4 at 19-20. But Norman is mistaken. Although the U.S.S.G. authorizes a sentencing court to consider the relevel conduct of the defendant's co-conspirators, *see United States v. Allen*, 533 F. App'x 406, 410 (5th Cir. 2013) (explaining that relevant conduct includes the reasonably foreseeable acts and omissions of other coconspirators), the defendant's conduct is the focus of the inquiry. Here, the Court applied § 2B1.1—which provides tiered sentencing enhancements based on the amount of intended loss—with an eye toward the amount of loss that Norman herself intended to cause. *See, e.g.*, *Isewele*, 635 F.3d at 203; *see also United States v. Iglehart*, 687 F. App'x 333, 339 (5th Cir. 2017) (per curiam) (describing the proper procedure for determining the amount of loss in healthcare fraud cases). Contrary to Norman's claim, nothing in § 2B1.1 required the Court to ignore Norman's conduct, or prove that she engaged in a conspiracy; rather, the calculation of her loss amount was a direct function of the "'amount of loss [Norman] intended to cause.'" *United States v. Umawa Oke Imo*, 739 F.3d 226, 240 (5th Cir. 2014) (quoting *Isewele*, 635 F.3d at 203). Norman's counsel was not ineffective for failing to raise the meritless argument that she presses in claim (13).

### 9. Claims 6, 7 & 9 – counsel's deficient performance relating to the restitution order

Claims (6), (7), and (9) challenge counsel's performance with respect to the Court's restitution order. *See* Doc. 4 at 12 (arguing, in claim (6), that the restitution award erroneously includes losses that Norman caused after January 11, 2013); *see also* Doc. 4 at 13 (claiming that her counsel was ineffective and arguing, in claim (7), that the Court erred in refusing to offset legitimate claims from the restitution award); Doc. 4 at 14 (arguing, in claim (9), that the "PSR lacks the evidentiary support for a restitution amount of $373,000."). Those claims are not cognizable in this section 2255 proceeding. "[S]ection 2255 claims can only be raised by persons in federal custody who assert that their custody is unlawful." *United States v. Walker*, 78 F.3d 582, 582 (5th Cir. 1996). Norman's "challenge to the ordered restitution and accompanying claim[s] of ineffective assistance of counsel do not pertain to unlawful custody and, accordingly, fall outside the scope of section 2255." *Id.* Thus, she is not entitled to relief on claim (6), (7), or (9) in this collateral proceeding.

### 10. Claims 1 & 15-16 – restatement of previous arguments regarding counsel's alleged ineffectiveness

For the most part, Claims (1), (15), and (16) simply repeat arguments that Norman raised in her other claims that have already been addressed herein – with one exception. For the first time, in claim (15), Norman alleges that her counsel was ineffective for failing to argue that the Special Assistant United States Attorney ("SAUSA") who was assigned to her prosecution was improperly "paid a percentage of the amount of restitution" that the Court awarded. There is no merit to that bald and scurrilous assertion—no SAUSA, including the prosecutor in this case, is paid a percentage of the government's restitution. Norman offers absolutely no basis for her claim to the contrary. Thus, Norman's counsel cannot be deemed ineffective for failing to raise that clearly meritless argument.

In sum, Norman is not entitled to relief on any of her 16 claims of ineffective assistance of counsel.

## III. RECOMMENDATION

For the foregoing reasons, it is recommended that the motion to vacate sentence under 28 U.S.C. § 2255 be **DENIED** as meritless and Norman's claims be **DISMISSED WITH PREJUDICE**.

**SIGNED** April 27, 2018.

_____
RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of this report and recommendation will be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). To be specific, an objection must identify the finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Auto. Ass'n,* 79 F.3d 1415, 1417 (5th Cir. 1996), *modified by statute,* 28 U.S.C. § 636(b)(1) (extending the time to file objections from 10 to 14 days).

_____
RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

20